# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

KRISTEN F.,

                                        Plaintiff,

             v.                                      3:20-CV-464
                                                     (ATB)

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                                        Defendant.

JUSTIN GOLDSTEIN, ESQ., for Plaintiff
CHRISTOPHER LEWIS POTTER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5, 7).

## I.   PROCEDURAL HISTORY

On February 24, 2017, plaintiff protectively filed an application for disability insurance benefits ("DIB"), alleging disability beginning July 7, 2015.[1] (Administrative Transcript ("T") at 15, 17, 68, 70, 165). Her application was denied initially on May 10, 2017. (T. 68-81). At plaintiff's request, Administrative Law Judge ("ALJ") Gretchen Mary Greisler conducted a hearing on March 8, 2019, at which plaintiff

---

[1] The court notes that there appears to be a typographical error in the ALJ's decision. She initially states that plaintiff's date of onset is July 15, 2015. (T. 15). However, it is clear from later in the ALJ's opinion and from the record that the alleged date of onset is July 7, 2015. (*See* T. 17, 70). The discrepancy is not relevant to this court's decision.

testified.[2] (T. 40-67). Vocational expert ("VE") Joseph Atkinson testified remotely. (T. 44, 61-66). On March 15, 2019, ALJ Greisler issued an unfavorable decision. (T. 15-24). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on March 17, 2020. (T. 1-5).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B). The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which

---

[2] Plaintiff was represented by non-attorney representative Matthew F. Nutting. (T. 116).

significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial

3

evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.    FACTS

Plaintiff was born on October 12, 1980 and was 34 years old on her alleged onset date of July 7, 2015.[3] (T. 45). Plaintiff lived in a house with her husband and three children, ages 15, 9, and 6. (T. 45). Plaintiff is right-handed. (*Id.*) Plaintiff testified that she last worked at NBT Bank as a customer service representative, a job where she was required to answer telephone calls regarding customers' accounts. (*Id.*) Plaintiff previously worked at a residence for individuals with developmental disabilities, where

---

[3] Plaintiff was 38 years old at the time of the ALJ's hearing. (T. 45).

she performed cleaning services and assisted clients with activities such as showering and dressing. (T. 49).  Plaintiff also worked as a hairdresser. (T. 50).

Plaintiff stopped working at NBT Bank because she could no longer perform the typing required due to carpal tunnel syndrome ("CTS"). (T. 50).  Plaintiff testified that she had constant numbness, tingling, and pain in both hands, but it was more pronounced on the right side. (T. 52).  Plaintiff had three CTS surgeries on her right hand and testified that she spoke to the doctor about having surgery on the left side, but she was worried about the outcome. (T. 53).  Plaintiff testified that she had not been back to the specialist about her hands since 2017 because he told her that there was nothing more he could do for her. (T. 60-61).

Plaintiff stated that in order to "grab a pen," she had to pick it up with her left hand and put it in her right hand between her index, middle, ring finger, and thumb. (T. 53-54).  Plaintiff testified that she did not write "grocery lists" very often.  She taught herself to write with her left hand, but the writing looked sloppy. (T. 54).  Plaintiff stated that she could only use a keyboard for ten to fifteen minutes before her "hand"[4] went numb. (*Id.*)  Plaintiff testified that she had "complications" when buttoning, buckling, or using a zipper. (*Id.*)  Plaintiff stated that she used her ring finger and tried to hold her thumb down, but sometimes she just used her left hand to zip and button. (T. 54-55).

Sometimes, plaintiff asked her husband for assistance. (T. 55).  Plaintiff described one instance during which she had to ask her husband's assistance because

---

[4] Plaintiff did not state to which hand she was referring. (T. 54).

the zipper was "stuck," and plaintiff could not zip it with either hand. (*Id.*)  Plaintiff described modifications she made for brushing her hair and putting it in a ponytail. (*Id.*)  She testified that more than half of her right hand was numb, and that her left hand would also get numb if she did "too much" with it. (T. 56).

Plaintiff testified that, although she had a driver's license, she did not drive "long distances," making her husband drive instead. (T. 56).  However, she stated that when she drove, she used her left hand, holding the bottom of the steering wheel with a "light grip." (*Id.*)  Plaintiff stated that she drove herself 35 to 40 minutes to the hearing without problems. (*Id.*)  She stated that she just had to try to switch hands "every once in a while." (T. 56-57).  Plaintiff testified that she could lift between 10 and 15 pounds. (T. 57).  Plaintiff stated that opening things was difficult for her. (T. 57).  She stated that she tried to open bottles with her right hand first because "they" told her not to stop using her right hand and to try doing things with that hand. (T. 57-58).  However, if she was unsuccessful at opening the bottle with either hand, she asked one of her children to help. (T. 58).  Plaintiff testified that she was able to do household chores by using her left hand to vacuum and put laundry in the washer and the drier. (T. 58).  She found it difficult to hold a broom and did not carry the laundry in a basket. (*Id.*)

Plaintiff also discussed her depression, which was treated only by her primary care providers. (T. 59).  She took medication which helped "a little bit," although there were approximately four days per week that she felt as if she did not "want to be associated with anybody." (*Id.*)  Plaintiff stated that she "fought it off" when she had her children and "put it on the back burner," but she finally began taking medication.

(T. 60).  Plaintiff testified that she had been "on and off" medication for depression since 2000. (*Id.*)  She stated that her symptoms "came back" after her first CTS surgery in July of 2015. (T. 59).  Plaintiff stated that her primary care physician has not suggested any other therapy or treatment for plaintiff's depression. (T. 60).  Plaintiff's primary care physician monitors the medication that plaintiff takes for depression and adjusts it when necessary. (*Id.*)

Plaintiff's counsel has summarized some of the medical evidence of record. (Plaintiff's Brief ("Pl.'s Br.") at 2-13) (Dkt. No. 12).  There are a substantial number of relevant medical records in the file.  However, rather than discussing the medical records at the outset, I will refer to the pertinent records during my analysis of the plaintiff's arguments.

## IV.    THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 7, 2015. (T. 17).  At step two, the ALJ found that plaintiff had the following severe impairments: bilateral CTS, obesity, and adjustment disorder. (*Id.*)  The ALJ found that plaintiff's remaining impairments were not severe. (*Id.*)  At step three of the evaluation, the ALJ found that the severity of plaintiff's impairments, either alone or in combination, did not meet or equal the severity of a Listed Impairment. (T. 17-19).  In making this determination, the ALJ considered Listing 11.14 (peripheral neuropathy) and considered plaintiff's obesity in accordance with Social Security Ruling ("SSR") 02-1p. (T. 18).  The ALJ considered plaintiff's mental impairment using Listing 12.04 (depressive, bipolar, and related

disorders).

At step four, the ALJ found that plaintiff had the RFC for light work, except that

> she can lift up to 15 pounds occasionally; can frequently
> handle and feel with both hands and can frequently finger
> with the non-dominant hand, but only occasionally finger with
> the dominant hand; can frequently reach; can perform simple,
> routine and repetitive tasks in a work environment free of fast
> paced production requirements, involving only simple work-
> related decisions and few, if any, workplace changes; and
> cannot climb ladders, ropes or scaffolds or work at
> unprotected heights or in close proximity to dangerous
> machinery.

(T. 19).  The ALJ determined that plaintiff's statements regarding her symptoms were

not consistent with the medical and other evidence of record. (T. 20).  The ALJ

considered the clinical findings, the lack of specialized treatment for her hands since

2017, the lack of any specialized mental health treatment since her date of onset, and

her ability to perform a variety of activities of daily living. (*Id.*)

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's

decision is not supported by substantial evidence:

1.    The ALJ's RFC determination is not supported by substantial evidence.
      (Pl.'s Br. at 15-23).

2.    The ALJ's evaluation of plaintiff's subjective claims was not supported by
      substantial evidence. (Pl.'s Br. at 23-25).

Defendant argues that the Commissioner's decision is supported by substantial

evidence. (Defendant's Brief ("Def.'s Br.") at 3-21) (Dkt. No. 13).  For the following

reasons, this court agrees with the defendant and will affirm the Commissioner's

decision.

## VI.    RFC EVALUATION/DUTY TO DEVELOP RECORD

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements

9

regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267

(N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*,

728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v.*

*Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*,

307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a

narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No.

3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing

SSR 96-8p, 1996 WL 374184, at *7).

### 2.    Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record

and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL

374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues

are not "medical issues," but are "administrative findings." The responsibility for

determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL

374183, at *2. These issues include whether the plaintiff's impairments meet or equal a

listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether

the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner,

the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The

ALJ must clearly state the legal rules that he applies and the weight that he accords the

evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2

(S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### 3.    Evaluation of Symptoms

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016, the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[5]  The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the

---

[5] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[6]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76.  However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019

---

[6] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996), which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)).  "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

### 4.    Duty to Develop the Record

Given the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Martin v. Comm'r of Soc. Sec.*, No. 18-CV-720(MWP), 2020 WL 611015, at *4 (W.D.N.Y. Feb. 10, 2020) (citing *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d 377, 386 (2d Cir. 2004)); 20 C.F.R. §§ 404.1512 (d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.").

Thus, before determining whether the ALJ's conclusions are supported by substantial evidence, a court must first evaluate whether the claimant was provided a full hearing "in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see Dougherty-Noteboom v. Berryhill*, No. 17-CV-243, 2018 WL 3866671, *7 (W.D.N.Y. 2018) (ALJ's duty to develop the record "is a threshold requirement for the SSA; the ALJ must develop the record prior to assessing whether a claimant is disabled"); *see also Archbald v. Colvin*, No. 14-CV-07569, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he reviewing court must ensure that 'all of the relevant facts [are] sufficiently

developed and considered' ") (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009)).

Furthermore, "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." *Dickson v. Astrue*, No. 1:06-CV-511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept.17, 2008). In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination. 20 C.F.R. §§ 404.1512(e), 416.912(e).[7] Although the ALJ must attempt to fill in any "clear gaps" in the administrative record, "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d at 79, n.5.

**B.    Analysis**

The ALJ found that plaintiff could perform "light work" with additional limitations as stated above. (T. 19-22). Plaintiff first argues that the ALJ "failed to identify evidence supporting the ability to perform a range of *sedentary* work, and the ALJ failed to explain how the RFC finding was supported by the evidence." (Pl.'s Br. at

---

[7] Effective March 26, 2012, the Commissioner amended these regulations to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances. The current regulations apply to plaintiff's case. *See Jimenez v. Astrue*, No. 12 Civ. 3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that even though the regulations were amended to remove the provision requiring the ALJ to recontact a treating physician to resolve an ambiguity in the record, the regulations still "contemplate the ALJ recontacting the treating physicians when 'the additional information needed is directly related to that source's medical opinion'").

15) (emphasis added).  Plaintiff does not elaborate on this argument.[8]  However, simply because the ALJ found that plaintiff could perform less than the full range of light work due to her additional limitations does not mean that the ALJ must evaluate whether plaintiff can do sedentary work. *See William J.D. v. Comm'r of Soc. Sec.*, No. 1:17-CV-981 (DEP), 2018 WL 6671533, at *7 (N.D.N.Y. Dec. 19, 2018).  In *William J.D.*, Magistrate Judge Peebles held that the mere fact that the ALJ found plaintiff capable of performing less than a full range of light work, "in no way eliminates every occupation listed in the Dictionary of Occupational Titles at the light exertional level.  Instead, 'an ALJ can properly find a claimant capable of performing a limited range of work in a given exertional category and then elicit [vocational expert] testimony to determine whether that claimant is disabled,' as was done in this instance by the ALJ." *Id.* (quoting *Gravel v. Barnhart*, 360 F. Supp. 2d 442, 448 (N.D.N.Y. 2005) (Sharpe, J.) (citing SSR 83-12, 1983 WL 31253 (1983)) (footnote omitted) (alteration in original).

In this case, the ALJ found that plaintiff could perform a limited range of light work due to her manipulative and other limitations and then consulted a VE to determine whether there were jobs in the light work category that plaintiff could still perform.  The VE found that such jobs were available.  Thus, the ALJ was not required to also determine that plaintiff could perform sedentary work.[9]  The court will now turn

---

[8] It is unclear whether this is a typographical error by plaintiff because counsel spends most of his brief discussing the ALJ's alleged failure to support her RFC finding because of plaintiff's additional manipulative limitations, related to light work.  However, defense counsel addressed the argument regarding the ALJ's failure to support a "sedentary work" finding. (Def.'s Br. at 3). Thus, the court has done the same.

[9] Manipulative limitations may be more critical in sedentary work. Social Security Ruling ("SSR") 96-9p (most unskilled sedentary jobs require good use of both hands and fingers, bilateral

to the ALJ's specific RFC finding.

Plaintiff states that the ALJ gave great weight to the consultative opinion of Dr. Gilbert Jenouri when establishing plaintiff's RFC. Plaintiff argues that Dr. Jenouri's opinion is too vague to constitute substantial evidence supporting the ALJ's finding that plaintiff could lift up to fifteen pounds, could frequently handle and feel with both hands, could frequently finger with the non-dominant hand but only occasionally finger with the dominant hand, and could frequently reach. (Pl.'s Br. at 16).

Plaintiff argues that Dr. Jenouri did not provide a function-by-function assessment of plaintiff's manipulative limitations, and without any other evidence, the ALJ was without substantial evidence to make such specific findings regarding plaintiff's manipulative abilities. (Pl.'s Br. at 16-17). This resulted in the ALJ improperly substituting her interpretation of the "raw medical evidence." (*Id*.) Plaintiff argues that the ALJ should have re-contacted Dr. Jenouri and plaintiff's treating medical providers. (Pl.'s Br. at 21). This court does not agree.

In this case, no treating physician, specialized or general provider, submitted a medical source statement setting forth specific restrictions on plaintiff's ability to perform work related functions. However, "such evidence is not required when the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity." *See Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109 (2d Cir. 2020) (internal citations omitted); *Monroe v. Comm'r of Soc. Sec.*, 676 F.

---

manual dexterity). However, simply because plaintiff has manipulative restrictions, limiting the full range of light work, does not foreclose finding that plaintiff can perform light work based upon the VE's testimony.

App'x 5, 8 (2d Cir. 2017) (where "the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required.")

Although the ALJ's RFC did not mirror a medical source statement, the ALJ considered the opinions in the record and weighed the conflicting evidence.  The ALJ gave "great weight" to Dr. Jenouri's consultative opinion. (T. 21).  In his report, Dr. Jenouri stated that plaintiff had "[m]ild to moderate restrictions, lifting, carrying, and grasping with both hands." (T. 396).   Such descriptions have been in some situations criticized for being too "general." *See Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013). However, the Second Circuit has held that these more general descriptions may substantiate the ALJ's RFC determination when the ALJ's conclusion is supported by other evidence she considered. *Johnson v. Colvin*, 669 F. App'x 44, 46-47 (2d Cir. 2016). *See Marie W. v. Comm'r of Soc. Sec.*, No. 1:19-CV-1053, 2021 WL 431656, at *4 (W.D.N.Y. Feb. 8, 2021) (finding that even "moderate" limitations in reaching and other postural limitations are consistent with the ability to perform light work); *Amons v. Astrue*, 617 F. Supp. 2d 173, 176 (W.D.N.Y. 2009) (RFC for light work with occasional fingering and reaching supported by medical opinion plaintiff had moderate limitations in walking, standing, squatting, climbing and reaching and moderate to marked limitations in fine hand motor work and frequent repetitive motion).

The ALJ noted that plaintiff testified that she could lift between 10 and 15 pounds. (T. 57).  While plaintiff had some problems with her non-dominant left hand, her more substantial limitations were on her right side.  At the hearing, plaintiff

testified that she was able to perform a variety of daily activities with some modifications and with some limitations.[10] (T. 53-59). Although plaintiff testified that she had difficulty buttoning and zipping, Dr. Jenouri found that plaintiff was able to "zip, button, and tie." (T. 54-55, 395). Plaintiff also testified that she was told "not to stop using [her right hand]." (T. 57).

There is no question that plaintiff has CTS, that three surgeries have been necessary to improve her abilities, and that she does have some residual functional limitations in both of her hands, more on the right side. The ALJ accounted for such limitations in her decision. Plaintiff's last surgery was in December of 2015.[11] Although plaintiff properly cites the medical records, which discuss plaintiff's limitations, counsel has failed to cite other portions of the same records which show that plaintiff had improved after her December 2015 surgery. Conflicting evidence is for the ALJ to resolve. *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).

For example, plaintiff cites a report, dated January 4, 2016 for the proposition

---

[10] In her decision, the ALJ stated that in May of 2016, plaintiff told her treating source that she was "'doing most of her normal activities, modifying things as she needs to.'" (T. 21) (citing T. 356).

[11] For the first time, plaintiff argues that the court should remand for the ALJ to consider a "closed period" of disability from July of 2015 until her last appointment with Dr. Fatti in May of 2017 or later. (Pl.'s Br. at 18-20). Defendant argues that any request for consideration of a closed period has been waived because plaintiff did not assert such a claim before the agency. Defendant's position is supported by recent case law. *See Melinda J.C. v. Comm'r of Soc. Sec.*, No. 19-CV-1618, 2021 WL 766860, at *6 (W.D.N.Y. Feb. 26, 2021) (citing *Ghio v. Astrue*, No. 10-CV-62, 2011 WL 923419, at *19 (D. Vt. Mar. 1, 2011) ("Given [the plaintiff's] failure to raise this issue before the ALJ, and failure to amend her claim to request a closed period of disability, the Court need not consider it."); *Wenner o/b/o A.R.L.D. v. Comm'r of Soc. Sec.*, No. 18-CV-826 (JJM), 2019 WL 7288507 at *8 n. 6 (W.D.N.Y. Dec. 30, 2019)). In any event, as discussed below, plaintiff has neglected to cite relevant portions of the medical records which show improvement during the relevant period with treatment, notwithstanding continued impairment which resulted in the multiple surgeries. (*See e.g.* T. 283) (plaintiff's strength was significantly reduced on the right side, the doctor stated that plaintiff still had significant symptoms which impacted her functional abilities, but was making some slow gains).

that plaintiff had ongoing swelling and decreased extension. (Pl.'s Br. at 8). However, in the same report, treating Nurse Practitioner ("NP") Terri J. Doolittle stated that although plaintiff's numbness was only "slightly better," her thumb and index finger were "significantly better." (T. 366). While plaintiff's "aggressive" physical therapy helped only for a while, and she had swelling and decreased extension of her thumb, "[o]verall, her motion seems to be improvement [sic]" except for extension of the MP joint of her thumb. (T. 366). Although there was decreased sensation in the median nerve distribution, her index finger flexion was "significantly improved." (T. 367). On December 21, 2015, plaintiff reported that her numbness and tingling were "better." (T. 372). Her neurovascular status was "intact." There was "mild swelling, but her index finger flexion was "significantly improved." (T. 373). Plaintiff was doing well in physical therapy, working aggressively, during therapy and at home. (T. 374). On December 28, 2015, NP Doolittle stated that plaintiff told her she was making "good progress," and NP Doolittle found that plaintiff's neurovascular status was "intact." (T. 370).

On May 16, 2016, plaintiff reported that she had trouble abducting, making it difficult for her to grasp and pick things up, but had somewhat improved since surgery. (T. 354). NP Doolittle noted that plaintiff knew that she might not get much better, but as stated above, plaintiff reported that she was able to do most of her normal activities, modifying as needed. (T. 355-56). On January 25, 2017, Dr. Fatti, plaintiff's treating orthopedic physician found that plaintiff was "doing better." (T. 336). Her motion was better, and her pain was "better," even though she still had significant numbness in the

ulnar nerve distribution in her right upper extremity. (*Id.*) Her alignment was "normal," there was no atrophy, no deformity, and no swelling. (T. 336-37). There was some soft tissue tenderness, and the motion of her wrist was "mildly" limited by pain and swelling. (T. 337). Strength testing was 4/5 on the right side, with no atrophy or elbow instability. (*Id.*) This was the only time that Dr. Fatti did any strength testing, but the court notes that Dr. Fatti's finding in January of 2017 was consistent with Dr. Jenouri's May 5, 2017 report, in which he found that plaintiff's grip strength was 4/5 on the right and 5/5 on the left. (T. 395). In addition to finding that plaintiff could zip, button, and tie, Dr. Jenouri found that plaintiff's finger dexterity was intact except for her "difficulty" in touching her pinky to thumb on the right side. (*Id.*)

On April 27, 2017, plaintiff's nerve conduction study showed normal conduction of the right ulnar nerve from above the elbow to the hand. (T. 436). The study also showed "improved conduction" of the right median nerve from the wrist to hand segment over previous electrical testing. (*Id.*) All other nerve conduction studies in the right upper extremity were normal. (*Id.*) Electromyography of the muscles innervated by the ulnar and cervical 8 root showed no evidence of muscle membrane instability at rest and demonstrated normal motor units on volition. (*Id.*) The "assessment" was pain and paresthesia right upper extremity.[12] (*Id.*) Plaintiff's physical examination showed that the "[s]trength of the right upper extremity, other than right thumb abduction, appeared intact. Sensation was reported altered to light touch in the right thumb, index, and middle fingers only." (T. 434).

---

[12] This report was authored by Michael P. Bome, PT, who worked with plaintiff's specialists at Syracuse Orthopedic Specialists. (T. 434).

Plaintiff's last appointment with Dr. Fatti was on May 23, 2017. (T. 433).  Dr. Fatti found decreased motion of the MP[13] joint of plaintiff's thumb, and the IP[14] joint was also limited.  Dr. Fatti found that plaintiff could barely touch the tip of her thumb to her forefinger, could not pinch, and had decreased sensation in her median and ulnar nerve distribution. (T. 433).

However, Dr. Fatti also noted the normal and improved nerve conduction studies. (*Id.*)  Dr. Fatti stated that plaintiff had been seen at the "pain clinic," and a nerve block was suggested for her hands and wrists, but plaintiff was not interested in this. (*Id.*)  Dr. Fatti suggested that plaintiff go back to the pain clinic to see "if they have anything else to offer." (*Id.*)  Plaintiff told Dr. Fatti that she would let him know, but in the meantime she was going to continue with her conservative treatment and follow up with Dr. Fatti on an "as needed basis."[15] (*Id.*)  Plaintiff did not return to Dr. Fatti, and she did not take

---

[13] The MP or MCP joint of the thumb "is a hinge joint that allows up to 80 to 90 degrees of flexion with minimal extension, adduction, or abduction." https://www.ncbi.nlm.nih.gov/books/ NBK538428/.  This joint allows an individual to bend and extend her thumb. https://www.assh.org/ handcare/safety/joints.

[14] Interphalangeal Joint (IP).  It is located at the tip of the finger just before the fingernail starts.

[15] Various of Dr. Fatti's reports assessed a degree of disability, anywhere from 50% to 100%. (*see e.g.* T. 433 - (50% on 5/23/17), 341- (50% on 12/15/16), 353 - (50% on 6/27/16), 368 - (100% on 1/4/16 -shortly after her last surgery)).  The ALJ correctly stated that she gave "little weight" to such conclusions because they did not include a function-by-function assessment of the plaintiff's abilities and address an ultimate issue ("disability") which is reserved for the Commissioner.  A percentage of disability is not relevant or binding for social security purposes. *See e.g. Fortuna v. Saul*, No. 19 Civ. 11066 (JCM), 2021 WL 961798, at *23 (S.D.N.Y. Mar. 15, 2021) (citations omitted).  The court in *Fortuna* noted that it was error to disregard a physician's functional assessment simply because it was rendered in conjunction with an examination for another agency, while recognizing that percentages of disability were not relevant to the social security analysis. *Id.* (citations omitted).  On February 26, 2016, in the same section in which he was estimating percentages of "disability," Dr. Fatti stated that plaintiff was "unable to do her ***current job***" because of the repetitive activity required with her right upper extremity. (T. 362) (emphasis added).  The ALJ agreed that plaintiff could not perform her "current" job.  Thus, the ALJ's decision to reject the treating physician's percentage of disability

his suggestion to go to the pain specialist.  Plaintiff testified at her hearing that she had not seen the hand specialist since 2017 because he said that there was nothing more they could do for her. (T. 60-61).

In her decision, the ALJ relied, in part, on plaintiff's failure to follow up with her hand specialist and her failure to take Dr. Fatti's suggestion to go back to the pain clinic to evaluate whether a nerve block would help. (T. 20-21).  The ALJ also correctly noted that plaintiff's subsequent primary care records did not show any ongoing signs of distress or deficits in strength, sensation, or fine manipulative functioning. (T. 21).  The court notes that occasional is defined as occurring up to one third of the work day, or approximately two hours. *See Daragjati v. Colvin*, No. 14 Civ. 2727 (BMC), 2015 WL 427944, at *9 (E.D.N.Y.  Jan. 31, 2015).  Thus, by limiting plaintiff's RFC to frequent feeling and handling with both hands, frequent fingering with her non-dominant hand, but only "occasional" fingering with her right hand, the ALJ accounted for plaintiff's limitations in her RFC.

A review of plaintiff's primary care records after April of 2017 supports the ALJ's determination. (T. 446-504).  Most of plaintiff's primary care records, beginning November 7, 2017[16] involve follow-up appointments for plaintiff's depression and other impairments, unrelated to plaintiff's hands. (T. 481, 479, 469, 464, 451).  On December 22, 2017, plaintiff saw her primary care provider for "depression" and

---

findings was supported by substantial evidence.

[16] Plaintiff was seen by one of her primary care providers (F.N.P. Sarah Singler) on May 12, 2017, but the examination was for an upper respiratory infection, and there was no mention of her CTS or her hand pain and numbness. (T. 486-89).

"epigastric pain." (T. 475). In the "History of Present Illness," plaintiff stated that she was not sleeping well "due to pain in hand (states nerve damage in hand)."[17] (T. 475). However, the subject of the provider's note was plaintiff's depression, not any issues that she was having with her hand, and the point of the provider's summary was that plaintiff was under stress which contributed to her mental state. (*Id.*) The reference to plaintiff's hand related to her inability to "sleep well" which also contributed to her mental state.

Other than mentioning plaintiff's history of CTS under "problem list," the only significant statements that were related to plaintiff's hands were made on January 19, and June 22, 2018, by treating provider, Physician Assistant ("PA") Carrie Anne Pisani, who reported that plaintiff's chronic nerve pain had been "better" after she started taking Cymbalta in December of 2017 . (T. 462, 469). There are several references to plaintiff being "right hand" dominant, but no discussion of hand pain or what her functional ability might be. (T. 472-73, 461, 446). Dr. Jenouri and Dr. Fatti found that plaintiff had 4/5 strength in her right hand, which would be consistent with some limitation. (T. 337, 395). In addition to being supported by Dr. Jenouri's report, the ALJ's RFC which included "occasional" fingering with plaintiff's dominant hand is supported by all the evidence discussed by the ALJ: her lack of specialized treatment after 2017, her own statements (at the hearing and to her medical providers), and her activities of daily living.

---

[17] The court notes that the provider's statement regarding "nerve damage" was not made after a physical examination, but was based upon plaintiff's statement explaining why she was not sleeping well. Plaintiff did not complain about her hands during the appointment.

The plaintiff's suggestion that the court remand for the ALJ to recontact plaintiff's medical providers or Dr. Jenouri is without merit. The ALJ is not required to further develop the record when the record contains adequate evidence for the ALJ to reach a decision, and substantial evidence supports the ALJ's finding. *Marie W. v. Comm'r of Soc. Sec.*, 2021 WL 431656, at *5 (citing *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) ("The ALJ is not required to develop the record any further when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'") (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). As stated above, the ALJ properly considered the evidence regarding plaintiff's hands. Plaintiff has not seen Dr. Fatti since 2017, there are no missing records from Dr. Fatti's office, and one of his last assessments found that plaintiff had 4/5 strength on the right side and that her neurological testing was almost normal. Plaintiff has rarely mentioned her CTS to her primary care provider, and has never mentioned the CTS in conjunction with a problem which needed medical attention. Thus, further development of the record is not required.

With respect to plaintiff's mental impairment, the ALJ stated that, although plaintiff also had a history of depression, her primary care records did not show any ongoing deficits or psychiatric abnormalities, and there was no evidence of any specialized psychiatric treatment. (T. 21). The ALJ gave partial weight to the consultative opinion of Dr. Amanda Slowik, Psy. D. (*Id.*) Dr. Slowik found that most of plaintiff's abilities were "mildly" limited. (T. 400-401). These abilities include understanding, remembering, or applying simple directions and instructions, using

reason and judgment to make work-related decisions and interacting appropriately with

supervisors, co-workers, and the public. (*Id.*)  Plaintiff's abilities with respect to

complex instructions and directions and maintain concentration are "moderately"

limited.  Her ability to sustain an ordinary routine was not limited at all. (T. 401).  Her

ability to regulate emotions is "mildly to moderately" limited.  Dr. Slowik stated that

the limitations were caused by "distractability," secondary to pain and anxiety. (*Id.*)

However, Dr. Slowik's conclusion was as follows:

> The results of the present evaluation appear to be consistent
> with psychiatric issues, but in itself [sic] these do not appear
> to be significant enough to interfere with the claimant's ability
> to function on a daily basis.

(T. 401).

Plaintiff argues that, based on Dr. Slowik's assessment, the ALJ should have

"explained" why the "social interaction limitations" were "rejected" because the VE

testified that there were no jobs plaintiff could perform if she could only have

"occasional" interaction with the public. (Pl.'s Br. at 23).  First, plaintiff cites

absolutely no basis for finding that a "mild" limitation in social interaction limits the

plaintiff to only "occasional" interaction with the public.  The ALJ rejected the portion

of Dr. Slowik's report in which she found the "moderate" restrictions noted above

because plaintiff's medical records did not show that plaintiff exhibited any on-going

difficulty understanding things, sustaining concentration, remembering things, or

regulating her emotions. (T. 22).  The ALJ pointed out that in Dr. Slowik's

examination, she stated that plaintiff's attention and concentration were only "mildly"

impaired. (T. 22) (citing T. 400).

Plaintiff has never been followed by a specialist for her mental impairments, nor has she participated in any counseling.  Her medication is managed by her primary care provider at United Health Services ("UHS").  A review of plaintiff's primary care records supports the ALJ's determination.  On May 5, 2017, FNP Sarah Singler reported that plaintiff's mood, affect, judgment, and insight were all normal. (T. 488). On November 7, 2017, plaintiff reported anxious, fearful thoughts, aggravated by conflicts and stress at home. (T. 481).  However, plaintiff's mood and affect were appropriate, and her behavior was appropriate for her age. (T. 484).  On December 26, 2017, testing revealed "severe depression," based on plaintiff's responses to questions. (T. 479).  Plaintiff reported difficulty concentrating, excessive worry, and fatigue, aggravated by stress at home and menstruation. (T. 475).  She tried Buspirone, but it made her angry. (T. 475).  However, PA Pisani's examination of plaintiff showed appropriate mood, affect, and behavior. (T. 478).  Plaintiff was started on Cymbalta on December 22, 2017. (T. 479).

On March 16, 2018, PA Pisani noted that plaintiff was experiencing a lot of stress at home, but that the Cymbalta was keeping plaintiff "steady," and she was not having major mood swings. (T. 464).  On examination, plaintiff's mood was appropriate, her attention, concentration, insight, and judgment were all normal. (T. 466).  PA Pisani reported that plaintiff's depression and anxiety were "stable" overall. (*Id.*)  On June 22, 2018, PA Pisani reported that plaintiff was having a fair response to Cymbalta, even though plaintiff thought the dose should be increased. (T. 461).  On September 25, 2018, plaintiff reported anxious and fearful thoughts, but testing

revealed only "mild depression," and although plaintiff reported some difficulty concentrating, PA Pisani's examination showed normal results. (T. 451, 454-55). On November 23, 2018, plaintiff's psychiatric findings were listed as "normal," with appropriate mood and affect. (T. 449). There is absolutely no evidence that plaintiff is unable to interact socially, and her behavior has always been listed as appropriate. Thus, no remand is required to evaluate plaintiff's ability to interact with "others."

Finally, plaintiff argues that the ALJ's evaluation of her symptoms was not supported by substantial evidence. Plaintiff argues that the ALJ cannot rely upon plaintiff's activities of daily living to "rebut his or her subjective statements . . ." unless plaintiff engages in those activities for sustained periods. (Pl.'s Br. at 24). The ALJ is not required to recite every bit of evidence that she considered as long as the court can glean her rationale from the evaluation. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013). There is case law suggesting that activities of daily living "alone" may be insufficient to support plaintiff's ability to work. *Walsh v. Colvin*, No. 1:13-CV-0603 (GTS/ATB), 2014 WL 4966142, at *8 (N.D.N.Y. Sept. 30, 2014) (ALJ rejected all opinions of record, and the court found that activities of daily living alone were insufficient to support the RFC finding). However, the Second Circuit holds that a significant range of daily activities may detract from a plaintiff's claim of disabling symptoms. *Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (per curiam); *Rusin v. Berryhill*, 726 F. App'x 837, 840-41 (2d Cir. 2018); *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015); *Roma v. Astrue*, 468 F. App'x 16, 19 (2d Cir. 2012).

In this case, the ALJ considered plaintiff's admitted daily activities, in

conjunction with the medical evidence, including plaintiff's failure to continue to treat with Dr. Fatti, her failure to follow through with his suggestion that she go back to the pain specialist for a nerve block,[18] and her failure to mention her hand impairment at most of her subsequent primary care appointments.  There is no question that plaintiff has some limitations, but the ALJ weighed the conflicting evidence and made an RFC determination which was consistent with the record as a whole.  The ALJ's analysis is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: April 27, 2021

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

[18] Although plaintiff testified that she stopped seeing Dr. Fatti because he told her that there was nothing more they could do for her (T. 60-61), this statement is not completely consistent with Dr. Fatti's statements in the medical records.  Dr. Fatti suggested that plaintiff go to the pain clinic to discuss whether a nerve block might be appropriate, but plaintiff was "not interested" in this. (T. 433).  Plaintiff told Dr. Fatti that she would let him know, but in the meantime would continue with conservative treatment and follow up with Dr. Fatti on an "as needed" basis. (*Id.*)